FILED

2025 Sep-30  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | |
|---|---|
| **CHRIS HAMBRIC, as administrator and legal representative of the Estate of GREGORY HAMBRIC,** ) ) ) ) ) | |
| ) | **6:23-cv-00748-ACA** |
| **Plaintiff,** ) | |
| **v.** ) | |
| **KOLBY TWILLEY, et al.** ) ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

Defendant Walker County Deputy Sheriff Kolby Twilley responded to a 911 domestic violence call with multiple shots fired. On scene, Deputy Twilley repeatedly demanded Gregory Hambric show his hands and asked Gregory to talk to him, but Gregory did not comply. Gregory eventually turned away from Deputy Twilley and began walking toward the house where Deputy Twilley believed Gregory's wife was hiding. Deputy Twilley yelled "no, no, no" and then started shooting his automatic rifle, striking and killing Gregory.

Chris Hambric ("Mr. Hambric"), the legal representative of Gregory Hambric's estate, filed this action against Deputy Twilley and Sheriff Nick Smith. The court (Coogler, J.) previously dismissed three of the five counts in the complaint. (Doc. 20). Deputy Twilley and Sheriff Smith now move for summary

judgment on the two excessive force claims brought pursuant to 42 U.S.C. § 1983 against each of them separately. (Doc. 52).

Mr. Hambric concedes that Sheriff Smith is entitled to summary judgment on the claim against him in his individual capacity (doc. 55), and so the court **WILL GRANT** summary judgment on Count Five without further discussion. The court **WILL GRANT** Deputy Twilley's motion for summary judgment on Count One because he is entitled to qualified immunity for the reasons stated below.

## I.    BACKGROUND

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In considering a motion for summary judgment, the court "view[s] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015).

Gregory and Helen Hambric and their adult son, Geoff, lived at 294 Hambric Road in Jasper, Alabama. (Doc. 50-1 at 00:19). The Hambric property contains two

residential structures, but only one is visible on approach. (Doc. 50-8 at 55). Geoff lives in that house ("the Old House"), and Gregory and Helen live in a double wide trailer ("Trailer") situated behind and to the right of the Old House (docs. 52 ¶ 3, 4; 50-8 at 55; 50-9 at 3).

On June 10, 2021, Helen called Geoff upset and asked him to come home. (Doc. 50-10 at 6). Helen "never call[ed]" Geoff unless something was wrong and she was clearly upset on this occasion, so Geoff drove home. (Doc. 50-10 at 6). When he arrived on their property, Geoff saw his mother walking toward the highway. (*Id.*). Helen got into Geoff's car, and Geoff drove toward the houses as his mother explained that Gregory was upset after the two had an argument. (*Id.*).

When mother and son reached the Old House, Geoff told his mother to go inside the house and lock the door while he went and checked on his father. (Doc. 50-10 at 7). Geoff then walked to the Trailer, found his father asleep, and left to return to the Old House. (*Id.*). Geoff heard the Trailer door shut at some point later[1] and saw his father coming down the ramp from the door of the trailer. (*Id.*).

As Gregory descended the ramp with a gun in hand, he started "yelling back and forth" with Geoff about why he was upset and demanding Helen return to the

---

[1]  In his deposition, Geoff testified that he heard the door shut as he walked toward the Old House. (Doc. 50-10 at 7). In his interview immediately following the shooting, Geoff testified that he was at the Old House speaking to his mother when his father emerged from the Trailer and demanding Helen return to the Trailer. (Doc. 50-6 at 00:19).

Trailer. (Docs. 50-10 at 7; 50-6 at 00:18). After Gregory announced a time limit for Helen to come out and began counting down while descending the ramp (doc. 50-6 at 00:35), Geoff told Gregory that Helen was no longer on the property (doc. 50-10 at 7). Gregory then threatened to kill Geoff. (Doc. 50-6 at 00:53).

According to Geoff, Gregory was upset because Helen disabled his ATM card and he could not access his disability funds. (Doc. 50-10 at 7). A similar fight occurred the month before and ended in a fistfight between father and son. (*Id.*). On this current occasion, Gregory shot two rounds at Geoff as he came down the ramp from the Trailer entrance to a concrete patio area. (*Id.*; *see also* doc. 50-1 at 2:06). Geoff attempted to deescalate the situation, but his father shot at him again. (Doc. 50-6 at 01:00 (Geoff confirming Gregory shot at him multiple times)). Geoff then told his mother to call 911. (Doc. 50-10 at 7).

*The 911 Call*

Helen called 911 to report that Gregory was "shooting and arguing" with Geoff. (Doc. 50-1 at 00:30, 2:06). Asked for her location, she stated that she was sitting in the Old House on the floor. (*Id.* at 01:44). She did not explain what she meant by the Old House. (*See id.*).

Helen informed the dispatcher that Gregory shot in the trailer stating that he was going to blow his head off and wanted her in there, so she left and went to "the house." (*Id.* at 02:10). From inside the Old House, she could hear Gregory "raising

4

sand" and shooting at her son. (Doc. 50-1 at 02:17). Geoff could be heard yelling, "Why are you shooting at me?" (*Id.* at 2:28). She also heard Gregory threatening her. (*Id.* at 2:34). Because she was hiding on the floor, she could not see out the window. (*See id.*).

Deputy Twilley heard the 911 dispatcher describe Helen's call over the radio while eating dinner with his grandparents fifteen minutes away. (Doc. 50-8 at 11). Deputy Twilley radioed that he would respond to the call (*see id.*), so the dispatcher put Helen on hold to speak to Deputy Twilley (doc. 50-1 at 3:03–3:40). The dispatcher reported that Helen was hiding in the closet afraid for her life, that Gregory was acting erratic, and that he had discharged a shotgun at their son. (Doc. 50-8 at 11).

When the dispatcher returned to her call with Helen, she informed Helen that a deputy was on the way. (Doc. 50-1 at 3:38). While waiting for a deputy to arrive, the dispatcher again asked Helen if she could see Geoff. (*Id.* at 4:30). Helen could not see Geoff or Gregory because she was hiding on the floor. (*Id.* at 04:24, 4:38). The dispatcher next asked if she thought someone was injured, and Helen replied, "Not yet." (Doc. 50-1 at 04:44). Helen then disclosed that Gregory had suicidal thoughts (*id.* at 04:50) and had tried to kill himself more than once (*id.* at 4:55, 5:06). About ninety seconds later, Helen reported that Geoff was trying to talk Gregory down but "he's hotheaded," and the two continued to argue. (Doc. 50-1 at 6:22).

The dispatcher asked Helen if Gregory still had a gun, but because Helen remained on the floor, she could not see out the window. (*Id.* at 6:40).

About eight and a half minutes after Helen first placed the call to 911, the dispatcher asked Helen if she could hear any changes outside. (*Id.* at 08:27). Helen reported that it had gotten quiet but she didn't know what was going on. (*Id.* at 08:36). "Just to be sure, so [she could] advise [the] deputies correctly," the 911 operator asked Helen if Gregory was holding the gun in his hands when she went into the house. (Doc. 50-1 at 08:50). Helen responded that when she entered the house, Gregory had his shotgun and was shooting. (*Id.* at 9:20).

Ninety seconds later, the 911 dispatcher asked Helen to report if she heard or saw any changes. (*Id.* at 10:02). A minute later, the dispatcher asked if it was still quiet, and Helen replied that it was "for right now." (*Id.* at 11:04). The dispatcher then confirmed Gregory's physical description. (Doc. 50-1 at 12:10). And Helen again stated that she could not hear her son "at all." (*Id.* at 12:50). Helen provided no further update, and the dispatcher did not make any other inquiries for the remaining three minutes of the call. (*Id.* at 13:20–16:25). The call ended when Deputy Twilley arrived on scene. (*Id.* at 16: 14).

*Law Enforcement Responds*

Deputy Twilley arrived at the Hambric property and stopped his vehicle just before the Old House. (Doc. 50-8 at 55). Wearing his uniform and armed with an

AR-15 semi-automatic rifle, Deputy Twilley got out of his car and began to approach the Old House. (Docs. 52 at ¶¶ 17, 22; 50-8 at 13; 50-3 at 00:08). As he did, Geoff came around to meet Deputy Twilley near the door of the Old House. (Docs. 50-8 at 15, 55; 50-3 at 00:10). Deputy Twilley instructed Geoff to show his hands, and Geoff complied as he told Deputy Twilley "it's not me[,] it's my dad." (Docs. 50-3 at 00:15; 50-8 at 16). Deputy Twilley asked Geoff where Gregory was, and Geoff told Deputy Twilley that Gregory was by Trailer and how to get there. (Doc. 50-8 at 17; Doc. 50-3 at 00:30). Geoff confirmed that his father had shot at him and that Gregory had "hid the gun." (Doc. 50-3 at 00:28, 00:40). Right before Deputy Twilley saw Gregory, Geoff said, "There is a gun, but I think . . . ." (*Id.* at 00:45). He did not finish his sentence because Deputy Twilley instructed Gregory to show his hands. (*Id.*).

Deputy Twilley first saw Gregory leaning against the driver's side of a vehicle parked just in front of the Trailer when Deputy Twilley reached the middle of the driveway. (Doc. 50-8 at 17; *id.* at PX1 (Gregory marked as "1"; Deputy Twilley marked as "B")). Deputy Twilley could see only Gregory's left side of his body and could not determine if Gregory was holding anything in his right hand. (*Id.* at 17). Deputy Twilley ordered Gregory to show his hands five times before Geoff implored his father to show his hands. (Docs. 50-3 at 00:47; 52 ¶¶ 21–22; 56 ¶ 67). Gregory did not comply, and Deputy Twilley yelled "get your hands up." (Docs. 50-3 at

00:55; 50-6 at 01:35). Geoff begged his father, "Dad, please, don't do this Dad." (Docs. 50-3 at 1:00; 50-6 at 01:38). Still noncompliant, Deputy Twilley ordered Gregory to show his hands five more times and ordered Geoff to "get out, go away." (Doc. 50-3 at 00:55–01:18). Neither Hambric complied. (*Id.* at 01:18).

At this point, Deputy Twilley asked Gregory twice to talk to him. (Doc. 50-3 at 01:21). Instead, Gregory asked Geoff, "Why'd you do it?" (*Id.* at 01:25). After four more attempts to get Gregory to show his hands, Deputy Twilley again asked Gregory to talk to him. (*Id.* at 01:25–01:40). Gregory then said, "I'm not showing you my goddamn hands." (*Id.* at 01:36). Again, Deputy Twilley asked Gregory to "talk to [him]." (Doc. 50-3 at 01:40). Gregory responded, "Fuck you." (*Id.* at 01:42).

Deputy Twilley then demanded that Gregory stop blading his stance (doc. 50-3 at 01:46), to stop reaching (*id.* at 01:47), and to show his hands (*id.* at 01:48). Gregory did not comply. (Doc. 50-8 at 27). Instead, Gregory responded, "What are you going to do shoot me?" (doc. 50-3 at 01:49), and Deputy Twilley replied, "No, I don't want to shoot you, show me your hands." (*Id.* at 01:50). Gregory countered that shooting him "was the only goddamn recourse [Deputy Twilley] has got." (*Id.* at 01:53). Deputy Twilley responded, "No, it's not, come on Greg, talk to me." (*Id.*). But Gregory turned and began walking toward the Trailer where Deputy Twilley assumed his wife was located. (Docs. 50-3 at 01:56–02:01; 50-8 at 18). Deputy Twilley then pulled his trigger twice, firing several bullets. (Doc. 50-3 at 02:02).

8

Immediately after, Deputy Twilley started ordering Gregory to show his hands and for Geoff to get back. (*Id.* at 02:10–02:15). Moments later, Geoff begged his father to show his hands. (*Id.* at 02:53).

Three minutes after Deputy Twilley left his patrol car, Geoff told Deputy Twilley that Gregory was unarmed. (Doc. 50-3 at 03:05). Deputy Twilley responded, "He's not unarmed. You just said he had a fucking shotgun on the porch." (*Id.* at 03:11; *see also* doc. 52 ¶ 37). Geoff replied, "He did. I don't know where it's at. Please don't shoot him again. Please." (Doc. 50-3 at 03:14). Deputy Twilley continued to order Gregory to show his hands and waited for backup before he advanced. (*Id.* at 04:44).

When back up arrived, Deputy Twilley and his sergeant approached the front of the car and found Gregory's body on a ramp leading to the door of the Trailer. (Docs. 50-3 at 08:20; 52 ¶ 38). Deputy Twilley then walked past Gregory's body and began calling for Helen (doc. 50-3 at 08:42, 09:00), who he believed was still inside the Trailer (doc. 50-8 at 23). When the sergeant asked for her location, Deputy Twilley replied "she's in [the Trailer] hiding." (Doc. 50-3 at 9:23). A minute later, Geoff reappeared and told Deputy Twilley that his mother was in the Old House. (*Id.* at 10:18).

## II.    DISCUSSION

### 1.  Official Capacity Claims

Sheriff Smith and Deputy Twilley argue that summary judgment is appropriate on any remaining official capacity claims. (Doc. 52 at 16–17). Mr. Hambric's complaint does not clarify whether the remaining claims against Smith and Twilley are in their individual or official capacities. (*See* doc. 19 at 7–9). And Mr. Hambric does not address the defendants' argument in his response to their motion for summary judgment. But the court construes the claims to be against Smith and Twilley in their individual capacities because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, because the only two remaining counts are asserted under § 1983, the claims cannot be against the defendants in their official capacity.

### 2.  Deputy Twilley is Entitled to Qualified Immunity.

Qualified immunity "protects an officer unless at the time of the officer's supposedly wrongful act the law was already established to such a high degree that every objectively reasonable officer in his place would be on notice that what he was doing was clearly unlawful given the circumstances." *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022) (quotation marks omitted). Accordingly, only "the plainly

incompetent" or those who knowingly violate federal law are not entitled to qualified immunity. *Id.*

Qualified immunity involves a burden-shifting analysis. First, the officer asserting qualified immunity must demonstrate that "he acted within his discretionary authority." *Id.* (quotation marks omitted). Second, if the officer does, the burden shifts to the plaintiff to show that the officer's actions violated his constitutional rights and that "the right was clearly established at the time of the alleged violation." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019). Here, Mr. Hambric does not dispute that Deputy Twilley was acting within his discretionary authority. (*See generally* doc. 56). So Mr. Hambric must show that Deputy Twilley violated Gregory's clearly established constitutional rights. *See Powell*, 25 F.4th at 920–21.

Mr. Hambric must establish both a constitutional violation and that the violation was clearly established as of June 2021. *See Priester v. City of Riviera Beach*, 208 F.3d 919, 926–27 (11th Cir. 2000). Here, Mr. Hambric alleges that Deputy Twilley used excessive force in violation of Gregory's Fourth Amendment rights. For purposes of summary judgment, the court's analysis begins—and ends— with whether the violation was clearly established. *See District of Columbia v. Wesby*, 583 U.S. 48, 62 n.7 (2018) ("[L]ower courts should think hard, and then

11

think hard again, before addressing both qualified immunity and the merits of an underlying constitutional claim." (quotation marks omitted)).

Mr. Hambric can use three methods to satisfy his burden of proving Deputy Twilley violated a clearly established right. *Powell*, 25 F.4th at 920–21. First, he may point to a materially similar decision from the Eleventh Circuit, United States Supreme Court, or the Alabama Supreme Court. *See id.* at 920. Second, Mr. Hambric may rely on "broad statements of principle in case law [that] are not tied to particularized facts" but that nevertheless put Deputy Twilley on notice. *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002). Third, Mr. Hambric may argue that Deputy Twilley's actions "so obviously violate[] th[e] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). This method "is a narrow exception to the normal rule that only case law and specific factual scenarios can clearly establish a violation." *Powell*, 25 F.4th at 921 (quotation marks omitted).

Mr. Hambric has a heavy burden. "Concrete facts are generally necessary to provide an officer with notice of the hazy border between excessive and acceptable force." *Id.* (quotation marks omitted). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id.* The Eleventh Circuit, though, has recognized a so-called "bright(ish) line" rule that "an officer may use deadly force when he has probable cause to believe that the suspect

poses a threat of serious physical harm, either to the officer or to others." *Harris-Billups ex rel. Harris v. Anderson*, 61 F.4th 1298, 1302 (11th Cir. 2023) (quotation marks omitted). "Probable cause, in turn, exists when the facts and circumstances [are] sufficient to warrant a prudent officer in reaching that conclusion." *Id.* (quotations omitted) (alteration in original).

Mr. Hambric does not satisfy his burden to prove that Deputy Twilley violated clearly established law. He does not point to—nor has the court found—any factually similar case from the Eleventh Circuit, the United States Supreme Court, or the Alabama Supreme Court. (*See* doc. 56 at 20–28). Mr. Hambric submitted a motion for leave to submit additional authority. (Doc. 62). The court considered the authority, but it does not support his claims. Two of the three cases referenced in the motion are unpublished, which cannot put Deputy Twilley on notice. *Crocker v. Beatty*, 995 F.3d 1232, 1241 n.6 (11th Cir. 2021). The published case Mr. Hambric relies on, *Pipkins v. City of Hoover*, 134 F.4th 1163 (11th Cir. 2025), is not materially similar, and it cannot put Deputy Twilley on notice because it was decided after the alleged constitutional violation. *Terrell v. Smith*, 668 F.3d 1244, 1256 n.5 (11th Cir. 2012).

Nor does Mr. Hambric argue Deputy Twilley's actions fall within the obvious-clarity exception. (*See* doc. 56 at 20–28). Mr. Hambric instead argues that there is no authority that suggests Deputy Twilley's conduct is constitutional. (Doc.

56 at 22). Even if this was the appropriate analysis (it is not), Mr. Hambric's claim—that there is no authority to suggest an officer may reasonably use force against a suspect when the officer has probable cause to believe the person poses a serious threat—is wrong. *See Harris-Billups ex rel. Harris*, 61 F.4th at 1302.

Mr. Hambric's contention that force was constitutionally impermissible because danger had subsided also fails because the evidence here does not support his contention. (*Id.* at 28 (citing *Ort v. White*, 813 F.2d 318, 323 (11th Cir. 1987)). First, Deputy Twilley knew the circumstances of the 911 call. He was responding to a domestic incident call at night where the suspect had argued with his wife and discharged a firearm at his son. (Doc. 50-8 at 11–12). Ms. Hambric detailed that Gregory had previously shot at her and that Gregory had threatened to shoot himself earlier in the day. (Doc. 50-1 at 02:10). As far as she knew, he was armed. (*Id.* at 9:20). Accordingly, Deputy Twilley knew Gregory "had proven his willingness to *use*" the gun. *Harris-Billups ex rel. Harris*, 61 F.4th at 1303.

Second, on scene, the situation remained hostile. When Deputy Twilley arrived, Geoff immediately informed him that his father had shot at him. (Doc. 50-3 at 00:40). Geoff also stated that Gregory had hid the gun somewhere. (*Id.* at 00:40). Geoff also testified that it was "obvious" his father was unarmed. (Doc. 50-10 at 13). But even construing this evidence in Mr. Hambric's favor, Deputy Twilley did not have to believe the gun was on Gregory's person. *See id.* Deputy Twilley knew

Gregory recently had a gun. Gregory remained in the area by the Trailer and concrete patio. (Doc. 50-3 at 00:48–1:50). This area was where he had fired multiple shots at Geoff. (Doc. 50-10 at 7). So an "objectively reasonable officer" could believe that Gregory had placed the gun in the area around him. Thus, he could still potentially access the weapon. Even if the gun was not "within his immediate reach," Gregory's "access to deadly weapons supports a reasonable conclusion that he posed a deadly threat." *Id.*

Third, Gregory did not comply with Deputy Twilley's commands. When Deputy Twilley saw Gregory, he immediately instructed him to show his hands. (Doc. 50-3 at 00:47). At all points in Deputy Twilley's body camera footage when Gregory is visible, his hands are not raised. (*See id.* at 00:47–2:00). Geoff also repeatedly pleaded with his father to follow Deputy Twilley's commands. (*Id.* at 1:00). At one point, Gregory said, "I'm not going to show you my goddamn hands." (Doc. 50-3 at 1:36). When Deputy Twilley repeated the instruction, Gregory said, "Fuck you." (*Id.* at 1:42). Thus, he repeatedly ignored Deputy Twilley's attempts to deescalate the encounter. Mr. Hambric counters that Geoff's testimony creates an issue of fact as to Gregory's compliance because Geoff claimed that Gregory did comply. (Doc. 56 at 23). But because the blatantly video contradicts that testimony, the video controls. *See Scott*, 550 U.S. at 380–81; *Cunningham v. Cobb Cnty.*, 141 F.4th 1201, 1211–12 & n.2 (11th Cir. 2025).

Mr. Hambric also disputes whether Gregory complied with Deputy Twilley's command to stop blading—meaning Gregory stood with one foot in front of the other with half of his body turned away from Deputy Twilley. He argues that Gregory complied with Deputy Twilley's command to stop blading by using "common sense" and completely turning away from Deputy Twilley. (Doc. 56 at 24). No "objective reasonable officer" would believe that a potentially armed suspect is complying with their instruction to stop "blading" by completely turning away from the officer. *See Powell*, 25 F.4th at 920. Thus, the evidence shows that Gregory remained noncompliant *See Harris-Billups ex rel. Harris*, 61 F.4th at 1305.

Fourth, Gregory made ominous and ambiguous statements to Deputy Twilley and Geoff. Gregory asked Geoff, "Why'd you do it?" (Doc. 50-3 at 01:25). Gregory then asked Deputy Twilley whether Deputy Twilley was going to shoot him. (*Id.* at 01:49). Deputy Twilley responded that he did not want to shoot Greg, but Gregory needed to show his hands. (*Id.* at 01:51). Gregory twice replied that shooting him was the "only goddamn recourse you got." (*Id.* at 01:53). Gregory then turned away from Deputy Twilley, and Deputy Twilley fired. (Doc. 50-3 at 1:55). These comments, combined with Gregory's prior actions, show that he was "acting erratically and displaying a frighteningly unstable frame of mind." *Harris-Billups ex rel. Harris*, 61 F.4th at 1303 (11th Cir. 2023) (quotation marks omitted); *see also*

16

*Long v. Slaton*, 508 F.3d 576, 581–82 (11th Cir. 2007) (noting that an "unstable frame of mind" supports probable cause to use deadly force).

In sum, Deputy Twilley knew he was responding to a domestic violence call where Gregory had shot at his son. As he was walking in the direction of Gregory and only seconds before Deputy Twilley confronted Gregory, Geoff said that his dad hid the gun. (Doc. 50-3 at 00:40). But Gregory remained in the same general area where he shot at Geoff. So, assuming Deputy Twilley heard Geoff tell him Gregory had hidden the gun, Deputy Twilley did not know where it was hidden. Gregory also did not comply with Deputy Twilley's commands. Rather, he made ominous comments that demonstrated an unstable mind. (*See infra* p.8). Finally, he suddenly turned away. In that context, it is not sufficiently clear that no reasonable officer would not have taken Deputy Twilley's action. *See Harris-Billups ex rel. Harris*, 61 F.4th at 1303; *Powell*, 25 F.4th at 923–24.

Moreover, to the extent there is any on-point decisional law or broad principles that apply to the situation, those cases support granting Deputy Twilley qualified immunity. *See Shaw v. City of Selma*, 884 F.3d 1093, 1100 (11th Cir. 2018) (explaining that an officer need not wait until the moment a noncompliant suspect uses potentially deadly force to stop the suspect); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010); *see also Davis v. Edwards*, 779 F. App'x 691, 695–96 (11th Cir. 2019) (granting qualified immunity when an officer responded to a 911

17

call about an armed individual, knew he was behaving erratically, and discharged his weapon when the individual did not comply with the officer's commands by seemingly reaching for a weapon); *Harris v. City of Montgomery*, No. 23-11816, 2024 WL 1090605, at *2–3 (11th Cir. Mar. 13, 2024) (granting qualified immunity to an officer who responded to a domestic violence call, encountered an evasive, noncompliant suspect, and fired his weapon when the suspect made a "sudden, unprovoked moment" even though the suspect did not have a weapon).[2]

\* \* \*

The short timeline and Deputy Twilley's knowledge at the time of the shooting reflect "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. And courts should not view those actions "with the 20/20 vision of hindsight." *Jones v. Fransen*, 857 F.3d 843, 852 (11th Cir. 2017) (quotation marks omitted). For those reasons, and because no materially similar case or principle put Deputy Twilley on notice, Deputy Twilley is entitled to qualified immunity, and the court **GRANTS** his motion for summary judgment.

---

[2] Although these unpublished cases are not binding, the court finds them persuasive. *See McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1060 (11th Cir. 2022). And, in the qualified-immunity context, courts may look to persuasive case law to show a potential constitutional violation is not clearly established. *Coffin v. Brandau*, 642 F.3d 999, 1016–17 & n.16 (11th Cir. 2011).

### III.    CONCLUSION

For the reasons above, the court **GRANTS** Mr. Hambric's motion for leave to submit additional authority. (Doc. 62). The court also **GRANTS** Sheriff Smith and Deputy Twilley's motion for summary judgment. The court **WILL ENTER SUMMARY JUDGMENT** in Sheriff Smith's and Deputy Twilley's favor.

**DONE** and **ORDERED** this September 30, 2025.

_____

**ANNEMARIE CARNEY AXON**